UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **JENNIFER SEED**,<br><br>Plaintiff,<br><br>v.<br><br>**MICHAEL S. REGAN**, Administrator,<br>U.S. Environmental Protection Agency, *et al.*,<br><br>Defendants. | Case No. 16-cv-0748 (TSC) |

**MEMORANDUM OPINION**

Dr. Jennifer Seed brings this action pursuant to the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 *et seq.*, against her former employer, the United States Environmental Protection Agency (EPA). The EPA has moved for summary judgment on Plaintiff's remaining claims. ECF No. 21. For the reasons set forth below, the court will GRANT the motion.

**I. BACKGROUND**

**A.    Factual Background**

Seed was a federal government employee for over twenty-three years until her retirement in 2013. Compl. ¶ 15, ECF No. 1. Between May 2009 and September 2013, she served as Deputy Division Director ("DDD") in the Office of Pollution Prevention and Toxics, Risk Assessment Division ("RAD"). ECF No. 21, Mot. for Summ. J., Exhibit ("DEX") 5, Seed Aff. at Bates p. 69 # 6-7[1]; DEX 9; ECF No. 21-2, Defs. Statement of Material Facts Not in Dispute

---

[1] Citations to "Bates" are to the Bates number on the EPA's exhibits to its Motion for Summary Judgment, ECF No. 21, as many of the pages within certain exhibits are not numbered sequentially.

("SOF") # 1.[2]  As DDD, Seed served as both a manager and a Senior Scientist at the GS–15 pay level.  DEX 5, Seed Aff. at Bates p. 70 # 10; *id*. p. 72 # 15, 17.  At various times, her duties included "a lot of science functions," including representing her office on several Task Forces (which took up approximately ten to twenty percent of her time), overseeing several projects that were the domain of Branch Chiefs, and assisting with "daily management activities."  DEX 1, Seed Dep. at 17-19.  Seed also provided "supervision/leadership to the Risk Assessment Division consisting of four branches and staff of 50-70 scientists," and shared responsibility with the Division Director for "directing/ guiding program implementation, oversee[ing] the development of ecological and human health hazard assessments and risk assessments. . . and human resources functions."  DEX 5, Seed Aff. at Bates p. 72 # 15.  Seed admits, however, that the "associate" (presumably the Associate Deputy Director) handled budgetary issues until he was removed from the position and Seed was assigned those duties.  DEX 1, Seed Dep. p. 26; *see* DEX 6, Henry Aff. at Bates p. 127 # 25.  Although she was a manager, she did not have traditional supervisory authority: "I wouldn't say I directly supervised anybody.  As deputy division director, you have supervisory authority, I guess, technically, over branch chiefs, but it never was that formal."  Seed Dep. p. 22.

In 2013, when Seed was about fifty-eight, the EPA began reorganizing the office that included Seed's division.  SOF # 1; Compl. ¶ 15.  As a part of that reorganization, Dr. Tala

---

[2]  Seed did not respond to the EPA's "Statement of Material Facts Not in Dispute."  Accordingly, the court will treat the EPA's proffered facts as undisputed, except to the extent Seed's brief points to portions of the record showing that an asserted fact is disputed or the court in reviewing the filings discovers evidence of a factual dispute.  *See* Local Civil Rule 7(h)(1) ("In determining a motion for summary judgment, the court may assume that facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion.").

Henry (who was approximately fifty years old) became RAD's Division Director and met with each manager, including Seed, to discuss the reorganization plans and sought their input on how to structure the changes. SOF # 4. During her meeting with Seed, Henry explained that the new RAD DDD position would involve mostly administrative duties, including budget formation/tracking, contracts management and travel. DEX Ex 6, Henry Aff. at Bates pp. 126-27; SOF # 5. Seed agrees that the new DDD position "focused primarily on budget and administration stuff." DEX 1, Seed Dep. at 48; DEX 5, Seed Aff. at Bates p. 108 # 4-5. Henry claims that when asked about performing those types of duties, Seed said she was not interested. DEX 6, Henry Aff. at Bates pp. 126-127; SOF # 5.

During Seed's deposition, she testified that she could not recall what she told Henry. DEX 1, Seed Dep. pp. 54-57. However, in the rebuttal affidavit she prepared early in the EEO process, Seed called Henry's comments "incorrect":

> The Associate Division Director (ADD) was responsible for budget. So, it is true that I was not responsible for those activities while there was an ADD. I never was asked nor did I state that I had no interest in performing those duties. . . . I did say that I did not see those duties as a full-time job, and I did not think that restricting the duties of a Department Division Director to focus entirely on budget and contracts was a wise decision for a science Division.

DEX 5, Seed Aff. at Bates p. 109 # 25. Instead, according to Seed: "I stated that I was not interested in the position AS DESCRIBED in the draft position description for the [DDD] and the Senior Science Advisor. I did not see either as full-time jobs by themselves, and in fact I had been doing both jobs for many years." *Id*. at Bates p. 108 # 17-18.

In August 2013, Henry sent the managers an email listing seven available positions: DDD, five Branch Chief positions and one Senior Science Advisor position. *Id*. at ECF pp. 202-03. She asked the managers to list their top three preferences and Seed responded by email explaining that she had previously performed the DDD role and the Senior Science Adviser

position, but had not been given the "courtesy of an explanation of why [she was] being equated with the past DD[D]." *Id*. at ECF p. 202. With respect to the available positions, Seed reiterated her stance during the meeting with Henry:

> As written, I don't really want any of the positions. As written, I don't see the DDD description as a fulltime job, nor do I see such a narrow focus as an asset for the new RAD. I would think we could learn from the other Divisions that this description leads to stagnation. If capable of multitasking, I think there is ample room for the DDD in the new RAD to also have a strong role in important science policy issues. I think I have more than demonstrated that I am capable of both.
>
> Having said that I only have 2 choices:
>
> 1) DDD
>
> 2) Senior Science Advisor

*Id*. Seed later complained that the email from Henry asked managers to "volunteer" rather than apply for positions, which she found objectionable. DEX 1, Seed Dep. pp. 48, 52.

Ultimately, Henry selected Stan Barone (who was approximately five years younger that Seed) for the DDD position. DEX 9 at Bates p. 157; DEX. 10; DEX 1, Seed Dep. p. 58. In her EEO affidavit, Henry explained her reasons for selecting Barone instead of Seed:

> [T]he complainant prefaced her preferences by stating she really did not want any of the positions available. She went on to limit herself to only two of the [positions]: (1) [DDD] and (2) was the Senior Science Advisor. . . .
>
> A critical factor in the decision to assign the Complainant to the Senior Science Advisor position rather than the [DDD] position was the administrative and procedural duties/responsibilities that were envisioned for the [DDD] position. . . . During my discussion with the Complainant in July 2013, when I asked the Complainant if she would embrace the administrative and procedural management duties, in particular budget formulation and execution, as the [DDD], she adamantly responded "no'; indicating she had other "skills" to offer the Division.
>
> Several other of the existing managers indicated the [DDD] position as their first preference. Each of these were currently supervising direct reports and all except the Complainant indicated during our one-on-one discussion their desire to take on all of the duties and responsibilities envisioned for the [DDD].

DEX 6, Henry Aff. at Bates pp. 127-28 # 25.

In September, Henry met with Seed to inform her that she was being assigned to the Senior Science Advisor position. DEX 9 at Bates p. 157; DEX. 10; DEX 1, Seed Dep. p. 58. Even though Seed had not indicated a preference for a Branch Chief position, she testified that during the meeting she asked Henry about that position and Henry said the EPA hoped to fill the positions with younger employees who had completed a leadership program. DEX 1, Seed Dep. pp. 37-38, 58-60.[3]

Seed subsequently applied for and was offered an acting Branch Chief position, but admits that she declined the offer because she did not want the job, but rather wanted to make a point that there was a difference between "volunteering" for a position "people don't have to apply for" and applying for a job. *Id*. at pp. 38-39, 45, 70. Neither Seed's pay nor grade were reduced when the EPA assigned her to the Senior Science Advisor position, SOF # 11, but Seed claims the move "trashed" her career at EPA because there were limits on how many persons at her pay level, GS-15, could be employed in one office and therefore "unless you're moving up, . . . you're demoted in function," and potential supervisors would question "why were you demoted, why would we want to promote you into this position. . . . [T]here must be something wrong. So yes. It squashes your career." *Id*. at pp. 61-62.

Seed alleges that after she began working as Senior Science Advisor, she was "treated as nothing" and had to perform duties below her pay grade. *Id*. at p. 52, 68. She testified that the EPA moved her to a cubicle and that senior managers would walk by her desk and "not even bother to say hello." *Id*. at p. 65. Unlike typical Senior Science Advisors, she was never invited

---

[3] Henry denies making the statement, Henry Aff. at Bates p. 129, but the court will, as it must on a motion for summary judgment, view the facts in the light most favorable to the non-movant.

to attend meetings with senior managers. *Id*. Seed also testified that she was "viciously ridiculed" because Henry had a way of "putting people down" or telling Seed to "just do it" when Seed objected to performing duties below her pay grade. *Id*. at pp. 67-69. Seed admitted, however, that Henry did not yell at her or anyone else. *Id*. at p. 68.

In her Complaint, Seed claims the office reorganization was a pretense for removing her and three other older managers from their positions. Compl. ¶ 31. She brought claims for disparate treatment and constructive demotion, as well as constructive discharge, retaliation, hostile work environment and disparate impact claims pursuant to the ADEA. She also mentioned, but did not include, a count for discrimination under Title VII.

**B.    Procedural Background**

The court previously granted the EPA's motion to dismiss Seed's claims for age based constructive demotion, constructive discharge, and retaliation—associated with the reassignment—because they were untimely. ECF No. 16. The EPA did not move to dismiss Seed's age-based disparate treatment claim associated with the reassignment, nor did it move for dismissal of Seed's hostile work environment, disparate impact claim, or purported Title VII claim.

The EPA subsequently moved for summary judgment on January 12, 2018, and at a hearing on the motion, the court noted that Seed's opposition brief did not meet the requirements of Federal Rule of Civil Procedure 56(c), which provides that "[a] party asserting that a fact cannot be or is genuinely disputed" support its position by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Nor did Seed's opposition brief meet the

requirements of Local Civil Rule 7(h)(1), which provides that an opposition brief must be accompanied by a "separate concise statement of genuine issues setting forth all material facts as to which it is contended there exists a genuine issue necessary to be litigated, which shall include references to the parts of the record relied on to support the statement." In addition, the opposition brief contained no citations to the record. *See* ECF No. 22.

The court dismissed Seed's Title VII claim pursuant to Federal Rule of Civil Procedure 12(b)(6) and granted summary judgment on Seed's disparate impact and hostile work environment claims, ECF Nos. 25, 28, leaving only her reassignment and workplace disparate treatment ADEA claims. The court ordered the parties to file supplemental briefing on, *inter alia*, whether Henry's statement regarding hiring younger employees for the Branch Chief position constituted direct evidence of discrimination, thereby making the *McDonnell Douglas* burden shifting framework inapplicable. ECF No. 29. The court also ordered briefing on whether Seed's reassignment constituted an adverse employment action. *Id*. Despite the court's prior admonishments regarding the deficiencies in Seed's opposition brief, Seed filed supplemental briefs that contained factual allegations, but no statements of fact or citations to the record as required by Rule 56 and Local Civil Rule 7(h).

## II. STANDARD OF REVIEW

Summary judgment is appropriate where there is no disputed genuine issue of material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). A dispute is "genuine" only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether a genuine issue of material fact

exists, the court must view all facts in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The moving party bears the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits. . . which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp.*, 477 U.S. at 323 (internal quotations marks and alterations omitted). The nonmoving party, in response, must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal quotation marks and alterations omitted).

### III.   ANALYSIS

To prevail on a motion for summary judgment in an ADEA disparate treatment case, a Plaintiff must produce evidence that "age was *a* [motivating] factor in the challenged personnel action." *Ford v. Mabus*, 629 F.3d 198, 206 (D.C. Cir. 2010) (emphasis in original). In some discrimination cases, "there is no direct evidence of discriminatory intent—that is, no statement that itself shows" age bias in the challenged employment decision, and such "cases sometimes can be resolved on summary judgment." *See Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 576 (D.C. Cir. 2013) (citations omitted). "But when the plaintiff offers direct evidence of discriminatory intent, that evidence will generally entitle a plaintiff to a . . . trial." *Id.* (citations and internal quotation marks omitted).

A.   <u>Direct Evidence</u>

Although Seed did not raise the issue in her initial opposition brief, the record contains Seed's testimony that Henry said that the EPA hoped to fill certain Branch Chief positions with

younger employees who had completed a leadership program.  *See* Seed Dep.  37-38, 58-60.  In her supplemental brief, Seed asserts that Henry's statement—made while discussing the Branch Chief positions—constitutes direct evidence of discriminatory motive because there was a "specific link" between the statement and the earlier DDD reassignment decision.  ECF No. 32, Pls. Supp. Br. at 2-3 & n.1.

The court is unpersuaded by Seed's argument.  As an initial matter, the record does not indicate that Henry made the statement in the context of the DDD hiring decision.  There is no evidence that when Henry and Seed spoke during the departmental reorganization process, they discussed Seed's potential interest in any positions other than the DDD and Social Science positions.  And when Henry asked Seed to rank her choices between the Senior Science Advisor, DDD, and five Branch Chief positions, Seed did not express an interest in the latter positions.  Only after Henry assigned Seed to the Senior Science Advisor position did Seed inquire about a Branch Chief position, at which time Henry allegedly expressed a preference for hiring younger employees for those positions.  Yet, despite this stated preference, when Seed subsequently applied for a Branch Chief position, Henry awarded the position to Seed, who turned it down.

On these facts, the court cannot find that Henry's statements constituted direct evidence of discrimination in awarding the DDD position.  "[D]irect evidence of discrimination is evidence that, if believed by the fact finder, proves the particular fact in question *without any need for inference*."  *Hajjar-Nejad v. George Washington Univ.*, 37 F. Supp. 3d 90, 125 (D.D.C. 2014) (citation omitted) (emphasis in original).  "One example of direct evidence is 'a statement that itself shows racial or gender bias in the employment decision.'"  *Steele v. Carter*, 192 F. Supp. 3d 151, 165 (D.D.C. 2016), *aff'd in part sub nom. Steele v. Mattis*, No. 16-5236, 2017 WL 2332608 (D.C. Cir. Feb. 21, 2017), *and rev'd in part sub nom. Steele v. Mattis*, 899 F.3d 943

(D.C. Cir. 2018) (citing *Vatel v. All. of Auto. Mfrs.*, 627 F.3d 1245, 1247 (D.C. Cir. 2011)). While an ageist statement might be "probative of discrimination, there must be a nexus between [a] stray remark and the adverse employment decision." *Kalekiristos v. CTF Hotel Mgmt. Corp.*, 958 F. Supp. 641, 665 (D.D.C.), *aff'd sub nom. Kalekiristos v. C.T.F. Hotel Mgmt. Corp.*, 132 F.3d 1481 (D.C. Cir. 1997) (citation omitted).

No such nexus exists here, where Henry first made the DDD position selection and then, after allegedly remarking that the agency hoped to fill the Branch Chief positions with younger employees, awarded Seed a Branch Chief position when she applied. Under these facts, Henry's remark does not constitute direct evidence or "belie a discriminatory approach to employment decisions generally." *See Waterhouse v. D.C.*, 124 F. Supp. 2d 1, 12 (D.D.C. 2000), *aff'd,* 298 F.3d 989 (D.C. Cir. 2002).

B. <u>DDD Position</u>

"The ADEA protects 'individuals who are at least 40 years of age.'" *Bean v. D.C.*, 264 F. Supp. 3d 242, 251 (D.D.C. 2017) (citing 29 U.S.C. § 631(a)); 29 U.S.C. § 633a(a). When "direct evidence of discriminatory intent is not available, a party may establish unlawful age discrimination by relying on the familiar burden-shifting scheme first articulated in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802-05, 93 S. Ct. 1817, 36 L.Ed.2d 668 (1973)." *Hall v. Giant Food, Inc.*, 175 F.3d 1074, 1077 (D.C. Cir. 1999). Under the *McDonnell Douglas* framework, the plaintiff has the initial burden of establishing that: (1) she is a member of a protected class; (2) she suffered an adverse employment action; and (3) the challenged adverse action gives rise to an inference of discrimination. *Chappell-Johnson v. Powell*, 440 F.3d 484, 488 (D.C. Cir. 2006). While the plaintiff maintains the burden of persuasion at all times, *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981), once

she establishes a prima facie case of discrimination, the burden of proof "shifts to the defendant 'to articulate some legitimate, nondiscriminatory reason for the action in question,'" *Wiley v. Glassman*, 511 F.3d 151, 155 (D.C. Cir. 2007) (cleaned up and citation omitted).  When asserting a legitimate, non-discriminatory justification for the challenged action, the defendant "need not persuade the court that it was actually motivated by the proffered reasons." *Burdine*, 450 U.S. at 254.

"In a Title VII disparate-treatment suit where an employee has suffered an adverse employment action and an employer has asserted a legitimate, non-discriminatory reason for the decision, the district court need not—and should not—decide whether the plaintiff actually made out a prima facie case under *McDonnell Douglas*." *Brady v. Office of the Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008).  Instead, the court's focus is whether the plaintiff produced "sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee" on a prohibited basis.  *Id.*; *see also Jones v. Bernanke*, 557 F.3d 670, 679 (D.C. Cir. 2009).  Courts must

> consider this question "in light of the total circumstances of the case," asking "whether the jury could infer discrimination from the combination of (1) the plaintiff's *prima facie* case; (2) any evidence the plaintiff presents to attack the employer's proffered explanation for its actions; and (3) any further evidence of discrimination that may be available to the plaintiff or any contrary evidence that may be available to the employer."

*Hamilton v. Geithner*, 666 F.3d 1344, 1351 (D.C. Cir. 2012) (cleaned up and citation omitted).

A plaintiff suing a private employer for discrimination under the ADEA "must prove by a preponderance of the evidence that age was the 'but-for' cause of the challenged employment action." *Spaeth v. Georgetown Univ.*, 943 F. Supp. 2d 198, 205 (D.D.C. 2013) (cleaned up) (quoting *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 180 (2009)).  In contrast, a plaintiff suing

a federal employer may obtain declaratory and possibly injunctive relief by establishing that "age was *a* factor in the employer's decision." *Steele*, 192 F. Supp. 3d at 164 (emphasis in the original) (citing *Ford v. Mabus*, 629 F.3d 198, 206 (D.C. Cir. 2010)). But to obtain reinstatement or backpay, the plaintiff "must meet the higher burden of proving that age was the 'but-for' cause" of the challenged employment action. *Steele*, 192 F. Supp. 3d at 184 (citing *Ford*, 629 F.3d at 207).

In its briefing, the EPA initially argued that Seed's appointment/ transfer to the Senior Science Advisor position was not an adverse employment action because she did not suffer a loss in pay or grade. After the United States Solicitor General clarified in another case that the United States considers lateral transfers to be actionable, the EPA conceded the same. ECF No. 33, Defs. Suppl. Br. at 12. And since the EPA filed its brief, the D. C. Circuit held in *Chambers v. D.C.*, 35 F.4th 870, 882 (D.C. Cir. 2022), *judgment entered*, No. 19-7098, 2022 WL 2255692 (D.C. Cir. June 23, 2022), that "discriminatory job transfers are actionable under Title VII."

While transfers or reassignments are generally actionable, the court is not persuaded that Seed suffered an adverse employment action when the EPA reassigned her to the Senior Science Advisor position. An essential element of a reassignment claim is that the plaintiff "*applied for* and was denied an available position for which he/ she was qualified." *See Lathram v. Snow*, 336 F.3d 1085, 1089 (D.C. Cir. 2003) (citations omitted) (emphasis in original). A plaintiff who seeks reassignment but does not apply for the desired position cannot establish the necessary injury required to constitute an adverse employment action. *See Kline v. Berry*, 404 F. App'x 505, 506 (D.C. Cir. 2010) (finding that plaintiff's alleged "injuries" did not constitute adverse employment actions).

Seed did not apply for the DDD position *as described in the job description*, but conditionally applied for the DDD position by explicitly stating that "[a]s written" she did not "really want any of the positions," but "[h]aving said that I only have 2 choices:  1) DDD 2) Senior Science Advisor." DEX 5, Seed Aff. at ECF pp. 202-203.  Thus, she suffered no injury when the agency failed to award her a position under her terms—namely without the focus on administrative/ budget duties, which would have entailed re-writing the job description.

Even if Seed suffered an injury, she has failed to produce evidence that her age was a motiving factor in the EPA's decision to award the position to someone else.  After expressing her disinterest in the DDD position as written, Seed cannot complain that the EPA awarded the position to someone who had expressed a "desire to take on all of the duties and responsibility envisioned for the DDD." Henry Aff. at Bates pp. 127-28 # 25.  Moreover, although not dispositive, both the deciding official, Henry, and the selected employee, Barone, were over forty.  The facts here simply do not give rise to an inference of discrimination.

C.  <u>Senior Science Advisor Reassignment</u>

Seed claims the EPA discriminated against her after she assumed her duties as a Senior Science Advisor by relocating her to a cubicle, treating her as "nothing," requiring that she perform duties below her paygrade, and not inviting her to attend meetings with senior managers. DEX 1, Seed Dep. pp. 52, 60, 65.  She also alleges the senior managers walked by her desk without saying hello.  *Id*. at pp. 52, 68.

But Seed offers no corroborating evidence, comparator evidence or any other type of evidence that she was treated less favorably than younger employees or that such treatment was based on her age.  *See Fields v. Office of Eddie Bernice Johnson*, 520 F. Supp. 2d 101, 105 (D.D.C. 2015) ("Self-serving testimony does not create genuine issues of material fact,

especially where that very testimony suggests that corroborating evidence should be readily available."). For example, she provides no evidence that relocation to a cubicle, changes in duties, or a change in invitations to meetings would be unusual for a person reassigned to a Senior Science Advisor position, or that other similarly situated employees were treated more favorably.

Seed also claims to have been "viciously ridiculed" by Henry, who Seed contends had a way of "putting people down" or telling Seed to "just do it" when Seed objected to performing duties below her pay grade. DEX 1, Seed Dep. at pp. 67-68. But Seed produced no evidence of disparate treatment; in fact, her assertion that Henry had a way of "putting people down" suggests that she did not single Seed out for unfair treatment. As such, her claim that the EPA treated her unfavorably after the reassignment fails.

## IV.   CONCLUSION

For the reasons set forth above, the court will grant EPA's motion for summary judgment on Seed's ADEA claims.

Date: November 30, 2022

*Tanya S. Chutkan*
TANYA S. CHUTKAN
United States District Judge